# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

GWEN S. STUTSMAN, )
)
      Plaintiff, )
)
vs. ) Case No. 11-cv-207-CVE-TLW
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
      Defendant. )

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Gwen S. Stutsman seeks judicial review of the Commissioner of the Social Security Administration's decision finding that she is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be AFFIRMED.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical

impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if

2

supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## **BACKGROUND**

Plaintiff, then a fifty-two-year-old female, applied for both disability benefits and social security income benefits on March 16, 2007. (R. 87, 90). Plaintiff claimed that back problems, osteoporosis, and high blood pressure left her disabled and unable to work. (R. 105). Plaintiff's claims were denied initially on July 2, 2007, and on reconsideration on October 12, 2007. (R. 42, 43, 44, 45). Although the Commissioner found that plaintiff suffered from "disorders of back, discogenic & degenerative," he concluded that this diagnosis did not render plaintiff disabled. (R. 42-45). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and that hearing was held on January 8, 2009. (R. 17-41, 64). The ALJ issued a decision denying benefits on March 4, 2009. (R. 7-17). The Appeals Council denied plaintiff's request for review on February 9, 2011. (R. 1). Accordingly, the ALJ's decision serves as the Commissioner's final decision.

Plaintiff timely appealed the ALJ's decision to this Court. (Dkt. # 2). Plaintiff raises three points of error in her appeal: (1) that the ALJ improperly evaluated plaintiff's treating physician's opinion, which stated plaintiff was disabled and unable to work; (2) that the ALJ's hypothetical to the vocational expert was flawed; and (3) that the ALJ made improper credibility findings. (Dkt. # 14).

## **The ALJ's Decision**

The ALJ found plaintiff was insured through September 30, 2005, and had not performed any substantial gainful activity since May 31, 2004. (R. 12). Plaintiff's medical records revealed a history of back injury and conservative treatment for chronic low back pain. Id. Based upon the

medical records, the ALJ found that plaintiff had one severe impairment, "degenerative disc disease of the lower spine."[1] Id. The ALJ concluded, however, that plaintiff's impairment failed to meet or medically equal a listing for disorders of the spine. (R. 12-13).

The ALJ's decision reviews plaintiff's testimony in detail. (R. 13-14). Plaintiff worked as a waitress. (R. 13). She injured her back in the 1980s and suffered a second back injury around the time of her disability. Id. The ALJ noted that plaintiff complained of pain in her back, radiating into her hips and down into her feet. (R. 14). Plaintiff stated that the pain resulted in severe limitations in her ability to stand, walk, and sit, requiring her to change positions frequently. Id. The opinion also notes plaintiff's testimony that her back, tailbone, and elbows "pop out of place." Id. The ALJ concluded, nonetheless, that plaintiff's complaints were not consistent with the medical evidence. Id.

Plaintiff's medical history reveals lower back problems as early as 1988. Id. The ALJ discussed medical records from a chiropractor in 1988, a medical doctor in 1992,[2] and plaintiff's more recent medical records from the Morton Clinic. Id. The ALJ took note of the treating physician's November 24, 2004, record, which states plaintiff is unable to work due to back pain. Id. On the other hand, the ALJ noted that records from 2007 indicate plaintiff was managing her pain with medication and that plaintiff did not take her medication every day as prescribed. (R. 15). The ALJ also concluded that plaintiff's x-rays "showed only age-appropriate degenerative

---

[1] Plaintiff had also alleged that her hypertension (high blood pressure) contributed to her disability. (R. 105). The ALJ found that plaintiff's hypertension did not rise to the level of a severe impairment, because plaintiff had "no end organ damage or functional loss" as a result of her hypertension. (R. 12). Plaintiff does not challenge the ALJ's findings on this point; accordingly, discussion of plaintiff's medical history will be limited to those issues affecting plaintiff's back and spine.

[2] The ALJ notes that the date on the medical record is July 20, 1992. This notation is a scrivener's error and has no impact on the analysis of the case. The medical record is actually dated July 20, 1993.

changes." Id. An examining physician's report from 2007 indicates that plaintiff suffered from "chronic back strain" and "degenerative arthritis of the lumbar spine." Id.

The ALJ gave great weight "to the State agency medical consultant's opinion" that plaintiff could perform light work and gave little weight to the treating physician's opinion. Id. The ALJ found that the treating physician's opinion was "not supported by significant objective abnormalities that would support such a severe loss of function." Id. The ALJ relied on the x-rays, which show only age-related degenerative changes and on the treating physician's own notes, which show plaintiff's medications relieve her symptoms. Id.

In addition to the ALJ's findings based upon the medical records, she found that plaintiff performed a number of daily activities, including taking trips to the casino, doing housework, and caring for her mother. Id. Accordingly, the ALJ concluded that plaintiff had the residual functional capacity to perform a full range of light work. Id. The vocational expert testified that plaintiff's past relevant work as a waitress qualified as light work. Id. Because plaintiff could perform her past relevant work, the ALJ concluded that plaintiff was not disabled. (R. 16).

**Plaintiff's Medical Records**

Plaintiff suffered back injuries prior to her alleged disability onset date of May 31, 2004. Plaintiff submitted a medical record that demonstrated that she had suffered an on-the-job injury while working as a waitress in December 1987. (R. 159). As of March 15, 1988, plaintiff's chiropractor found that plaintiff had reached maximum medical improvement with "a 23% whole man permanent impairment to the thoraco-lumbo-pelvic spine." (R. 160). The chiropractor found that plaintiff still suffered "muscle weakness in the hip region," "pain and spasm in the low back structures," and "mobility with stiffness." (R. 159). The chiropractor opined that plaintiff would require "palliative care in the future in the form of physical therapeutics." (R. 160).

Plaintiff suffered an on-the-job left knee injury in December 1991. (R. 164). On July 20, 1993, Dr. Jim Martin evaluated plaintiff "for multiple injuries and the determination of the disability due to the combination of these injuries." Id. With respect to plaintiff's complaints of back pain, Dr. Martin found that plaintiff experienced "muscle spasms and tenderness over the mid thoracic to lower lumbar musculature, with point tenderness over the sacroiliac joints." Id. Plaintiff also had "a positive straight leg raising test bilaterally at 50 degrees in the supine position." (R. 163). Dr. Martin concluded that plaintiff's knee injury increased her permanent partial impairment to "42% to the whole person." Id. The record does not contain any additional information related to this injury or to any pursuit of disability benefits.

Plaintiff's medical records do not indicate that she received any treatment between 1993 and November 24, 2004. On that date, plaintiff completed a medical history form as a new patient at the Morton Health Center. (R. 201). The form indicates that plaintiff complained of arthritis and depression and that she met with Dr. Raeanne Lambert. (R. 197, 202). During that examination, plaintiff reported a history of back injuries, reported that her back pain was increasing and told Dr. Lambert that she believed she had osteoporosis but had never been tested. Id. Following her initial examination, Dr. Lambert issued a letter for the purpose of confirming plaintiff's eligibility for food stamps, stating that plaintiff was "currently unable to work due to her acute joint and back pain." (R. 200). Dr. Lambert issued a second letter, almost identical to the first, pronouncing plaintiff disabled in July 2005. (R. 199).

After her initial visit in November 2004, plaintiff continued to receive treatment from Dr. Lambert in the form of medication management. (R. 166-96, 230-33, 236). Dr. Lambert initially

prescribed Tramadol[3] for plaintiff's back pain. (R. 198). Plaintiff initially reported that Tramadol provided "some relief," as did "popping" her back "into place." (R. 195) Dr. Lambert added Flexeril[4] to plaintiff's medication regimen in December 2004. (R. 195-96). In February 2005, plaintiff reported that she was controlling her back pain by taking Flexeril and keeping her feet elevated. (R. 191-92). Plaintiff continued taking pain medication and remained "stable." (R. 169). As late as August 2007, plaintiff reported that her pain medications were "working well." (R. 231).

Dr. Lambert recommended that plaintiff receive an MRI scan of her spine in July 2005, but plaintiff was unable to pay for the test. (R. 177, 182). On August 10, 2007, plaintiff received an x-ray of her spine. (R. 232). The x-ray showed "[s]ome age appropriate degenerative changes," but overall, the x-ray was negative. Id.

As part of the disability proceedings, the Commissioner ordered plaintiff to undergo a consultative examination. (R. 210). Dr. Sidney Williams examined plaintiff on June 6, 2007. Id. During that exam, plaintiff complained that her pain was an eight on a scale of zero to ten and that she suffered constant pain. Id. Plaintiff described the pain as "tingling, pins, needles, shooting, hot, burning, and stabbing." Id. She also complained that the pain interfered with her ability to do anything, from bathing herself to household chores to social and recreational activities. Id.

Dr. Williams found that plaintiff had "mild to moderate difficulty getting up and down from seated position apparently because of back pain." (R. 212). Plaintiff did have "a slightly

---

[3] Tramadol is a medication for moderate to moderately severe pain caused by conditions such as arthritis, osteoarthritis, or fibromyalgia.
See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960 (last visited on May 3, 2012).

[4] Flexeril is a brand name for cyclobenzaprine. It is a muscle relaxant used to "relieve pain and discomfort caused by strains, sprains, and other muscle injuries." See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699/ (last visited on May 3, 2012).

bent posture" and a slower gait, but she was "able to perform heel and toe walking maneuvers." Id. Plaintiff also had normal grip strength in her hands. Id. Dr. Williams found some slight range of motion limitations in plaintiff's back and noted that these areas were tender and caused plaintiff pain. (R. 213, 216). Dr. Williams concluded that plaintiff suffered from "chronic back strain" and "degenerative arthritis, lumbar spine." (R. 212).

Following Dr. Williams' examination, the Commissioner asked for a physical residual functional capacity assessment from one of the agency's medical consultants. (R. 220). Dr. Thurma Fiegel reviewed plaintiff's records and determined that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand for six hours, and sit for six hours in an eight-hour workday. (R. 222). Dr. Fiegel explained that the examinations showed "mild limitation in spine and neck," and the 1988 x-ray "showed a wedging at L4-5," but the rest of plaintiff's spinal system was normal. Id. Dr. Fiegel considered plaintiff's history and the limitations of her pain in reaching her conclusion. Id.

**The ALJ Hearing**

At the hearing, plaintiff testified that she worked as a waitress at three different restaurants between 2000 and May 2004. (R. 17, 23). She told the ALJ that her back injury prevented her from working.[5] (R. 23-24). She also stated that she was in constant pain, even with her pain medication and muscle relaxant. (R. 25). Her back, ribs, and tailbone would occasionally "pop[] out of the socket." (R. 31). She testified that she could only stand for twenty minutes at a time, walk for thirty minutes at a time, and sit for fifteen or twenty minutes at a time. (R. 27-28).

---

[5] Plaintiff also complained of other symptoms, such as pain in her elbows, numbness in her arms, and difficulty grasping items and reaching. (R. 31-35, 37). She attributed those symptoms to high blood pressure, hardening of the arteries, and a possible issue with her kidneys. (R. 31, 33, 37).

8

Plaintiff testified that she constantly changes positions to alleviate pain, which causes her to sleep poorly at night. (R. 35-36). Plaintiff explained that during the day, she spends most of her time in a reclining position. (R. 24). She testified that she could only do housework by taking numerous breaks. (R. 26). Plaintiff also stated that she would occasionally go "to the casino or something for an hour or so," but she spent most of the day in a chair at home. (R. 37). Plaintiff could prepare her own meals, but she avoided exertion, because it would aggravate her back pain. (R. 36-37).

The vocational expert reviewed plaintiff's past relevant work as a waitress and testified that waitressing qualified as "light exertion," although she noted that plaintiff reported "medium exertion." (R. 39). The ALJ then proposed a hypothetical to the vocational expert describing an individual of plaintiff's age, with a high school education and plaintiff's work history, who could perform light work as it is defined in the regulations with the limitation that the individual could "sustain activity for about 15 minutes at a time, and then would need to rest." (R. 39-40). The ALJ included the specific exertional limitations established in the physical residual functional capacity assessment in her hypothetical. (R. 39-40). The vocational expert testified that under those circumstances, plaintiff would not be able to perform her past relevant work or any work. (R. 40). The ALJ did not pose any additional hypotheticals to the vocational expert, nor did plaintiff's attorney have any questions for the vocational expert. (R. 40).

## **ANALYSIS**

**Medical Source Opinions**

Plaintiff first argues that the ALJ did not perform a proper treating physician analysis. (Dkt. # 14 at 2). Specifically, she asserts that the ALJ should have given her treating physician's

9

opinion controlling weight and should not have given great weight to the opinion of the consulting physician who completed the residual functional capacity analysis. (Dkt. # 14 at 2-3).

Ordinarily, a treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). See also Hackett, 395 F.3d at 1173-74 (citing Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003)). This deference, however, only extends to *medical* opinions rendered by a treating physician. See Lackey v. Barnhart, 127 Fed.Appx. 455, 457 (10th Cir. 2005) (unpublished)[6] (reciting the definition of a "medical opinion" as stated in 20 C.F.R. § 404.1527(a)(2)). When a treating physician opines on the ultimate issue of disability, that opinion "can never be entitled to controlling weight or given special significance." SSR 96-5p (holding that "whether an individual who has applied for title II or title XVI disability benefits is 'disabled' or 'unable to work'" is an issue reserved to the Commissioner.). See also 20 C.F.R. §§ 404.1527(d), 416.927(d). In this case, the medical opinions to which the ALJ assigned little weight are the November 2004 and July 2005 letters which state that plaintiff is "unable to work." (R. 199, 200). Plaintiff cites to no other medical opinions from Dr. Lambert. Dr. Lambert's statements clearly do not qualify as medical opinions; therefore, the ALJ was not permitted to give Dr. Lambert's opinions controlling weight. See Lackey, 127 Fed.Appx. at 457. See also SSR 96-5p.

The ALJ does not state in her opinion whether she analyzed the treating physician's opinion as a medical opinion or as an opinion on the ultimate issue of disability. Ordinarily, such an omission would require remand for the ALJ to conduct the proper analysis. See, e.g., Jensen

---

[6] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

v. Barnhart, 436 F.3d 1163, 1165 (10th Cir. 2005) (holding that the "failure to apply the correct legal standard or to provide th[e] court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal."). However, because the treating physician's opinion was clearly a non-medical opinion that could never be given controlling weight, and because the ALJ did provide an explanation for the weight she gave the opinion, see infra, the undersigned recommends that the Court consider the omission harmless error. See Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004).

The harmless error analysis in disability cases is to be narrowly construed, because the Court "may not create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself." Id. See also Grogan v. Barnhart, 399 F.3d 1257, 1263 (10th Cir. 2005). Even with those restrictions, the Court may still "supply a missing dispositive finding under the rubric of harmless error" when the Court determines "that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." Allen, 357 F.3d at 1145. Harmless error includes those situations where the ALJ considered the evidence in question but did so improperly. See id. The harmless error analysis here is proper. Dr. Lambert's opinion that plaintiff was "currently unable to work" could never be given controlling weight, as plaintiff argues it should have been, since it was an opinion given on the ultimate issue of disability.

Nonetheless, even though Dr. Lambert's opinions were not entitled to controlling weight, the regulations state that "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p. The ALJ was still required to "evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." SSR 96-5p. The ALJ must determine the weight the opinions should be given using the

following factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c): (1) "length of the treatment relationship and the frequency of examination;" (2) "nature and extent of the treatment relationship;" (3) the relevant evidence, such as "medical signs and laboratory findings," that support the opinion; (4) the opinion's consistency "with the record as a whole;" (5) whether the treating physician is a specialist; and (6) any other factors brought to the ALJ's attention "which tend to support or contradict the opinion." 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

Here, the ALJ ultimately determined that Dr. Lambert's opinions were entitled to "little weight." (R. 15). The ALJ explained her reasoning for this determination as follows:

> Little weight is given to Dr. Lambert's opinion as to the claimant's inability to work, as it is not supported by significant objective abnormalities that would support such a severe loss of function. The degenerative changes demonstrated by x-rays are only those generally associated with a person her age, and not indicative of an impairment that would preclude all work. In addition, her opinion is contradicted by the reports from her own clinic showing the claimant's medications were relieving her symptoms.

(R. 15). In reaching this conclusion, the ALJ applied two of the six factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). First, the ALJ analyzed Dr. Lambert's opinion in light of the "medical signs and laboratory findings" from plaintiff's x-rays. See 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3); (R. 233). The x-ray, as the ALJ stated, showed "age appropriate degenerative changes" but was otherwise "negative." (R. 233). Second, the ALJ considered the consistency of the "record as a whole." See 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). The ALJ correctly found that Dr. Lambert's notes stated that the conservative course of pain medication was effective in relieving plaintiff's symptoms throughout the course of treatment. (R. 169, 195, 231).

The undersigned finds that this analysis is sufficient to satisfy the requirement that the ALJ consider the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). While the ALJ

12

had additional evidence in the record to support her determination, an ALJ is not required to discuss all six factors in order to provide sufficient evidence to support the decision to give a treating physician's opinion little weight. See Oldham v. Astrue, 509 F.3d 1254, 1257-58 (10th Cir. 2007). Accordingly, the undersigned recommends that the Court find that the ALJ properly gave little weight to Dr. Lambert's opinions.

Plaintiff also argues that the ALJ improperly relied on the State agency medical consultant's finding that plaintiff was able to perform light work, because the State agency finding contradicted the treating physician's opinions. (Dkt. # 14 at 3). Because the ALJ properly discounted Dr. Lambert's opinions, this argument is without merit.

Plaintiff also attacks the consultant's finding, claiming that the consultant did not review the medical records or the findings of the consultative examination. (Dkt. # 14 at 4). The State agency's medical consultant completed a physical residual functional capacity assessment on June 22, 2007. (R. 221-28). At that time, plaintiff had attended the consultative examination, but plaintiff did not receive x-rays until August 2007. (R. 210, 233). The Commissioner later asked for an updated residual functional capacity assessment. The second assessment was completed on October 12, 2007, and the State agency medical consultant reviewing the case stated that he had "reviewed all of the medical evidence in file" and affirmed the original assessment that plaintiff could perform light work. (R. 234). The Commissioner received the x-ray results on October 10, 2007, as indicated by the facsimile notation at the top of the record's pages; therefore, the State agency medical consultant would have had all of the information, including plaintiff's most recent x-rays, at the time of the second assessment. (R. 230). Accordingly, the evidence does not support plaintiff's claim that the State agency medical consultant did not

formulate his opinion based on the entire record, and the ALJ did not err in relying on that opinion.

**The ALJ's Hypothetical**

Plaintiff's argument regarding the ALJ's hypothetical is not entirely clear. First, plaintiff argues that the hypothetical *would be* incomplete without the limitations included by the ALJ. (Dkt. # 14 at 4-5). Then, plaintiff argues that the ALJ's hypothetical actually *was* incomplete, because it failed to include all of the documented limitations, but plaintiff does not identify a single limitation that should have been included. Id. Instead, plaintiff recites a litany of rules related to the analysis of vocational hypotheticals. Thus, plaintiff's sole argument appears to be that the ALJ posed a hypothetical that included a limitation – rest periods after fifteen minutes of work – that, if true, would have required the ALJ to find plaintiff disabled. (Dkt. # 14 at 5). Because no other hypothetical was given and plaintiff's counsel did not ask for one, plaintiff complains that her counsel ". . . was probably tricked [by the ALJ] into believing that he had won his client's case, until the residual functional capacity changed to light work."[7] (Dkt. # 14 at 5).

To the extent that plaintiff challenges the ALJ's finding that plaintiff had the residual functional capacity to perform light work, that issue is addressed in the analysis of the medical source opinions, supra. If plaintiff is challenging the ALJ's decision not to rely on the hypothetical posed to the vocational expert, that argument is without merit. In this case, the ALJ decided the issue of plaintiff's disability at step four of the five-step process. Step four requires a determination "whether the claimant has the residual functional capacity to perform the

---

[7] This statement is somewhat confused. The ALJ did not "change" the residual functional capacity in posing the hypothetical to the vocational expert. Rather, the hypothetical began with a presumption that plaintiff could perform light work but would have a limitation requiring her to take breaks every fifteen minutes.

requirements of her past relevant work." (R. 12). See 20 C.F.R. §§ 404.1520(f), 416.920(f). As the ALJ explained in the decision, if plaintiff was able to perform her past relevant work, she cannot be found disabled. (R. 12) (citing 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), and 416.965).

Because the ALJ determined that plaintiff was not disabled at step four, plaintiff still bore the burden of establishing her disability. See Turner v. Heckler, 754 F.2d 326, 328 (10th Cir. 1985). Until the analysis reaches step five and the burden shifts to the Commissioner, the ALJ is not required to elicit or to rely on the testimony of a vocational expert. See Musgrave v. Sullivan, 966 F.2d 1371, 1376 (10th Cir. 1992) (citing Walden v. Bowen, 813 F.2d 1047, 1049 (10th Cir. 1987) (per curiam)). Accordingly, the ALJ was not required to pose any hypothetical to the vocational expert. The record does establish, however, through the testimony of the vocational expert, that plaintiff's past relevant work as a waitress was categorized as light work in the Dictionary of Occupational Titles. (R. 39-40). The ALJ, therefore, properly found that because plaintiff was capable of performing light work, she was also capable of performing her past relevant work and was not disabled.

**Credibility Findings**

Finally, plaintiff argues that the ALJ erred in finding her testimony not credible. Plaintiff contends that the ALJ erred in using boilerplate language, failing to specify which testimony she accepted and which testimony she rejected, and failing to consider the absence of "exaggeration of pain and other symptoms" as evidence of plaintiff's credibility. (Dkt. # 14 at 5-6).

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence, because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary

15

of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

Plaintiff's "boilerplate language" argument fails in this case, because boilerplate language is insufficient to support a credibility determination only "in the absence of a more thorough analysis." Hardman v. Barnhart, 362 F.3d 676, 679 (10th Cir. 2004). Although the ALJ did recite the generally disfavored boilerplate language, the ALJ also cited to the objective medical evidence, plaintiff's inconsistent complaints about her symptoms, and plaintiff's activities of daily living, which included housework and occassional trips to the casino to "get out of the house." (R. 14, 15). The ALJ explained the objective medical evidence in great detail in assessing plaintiff's residual functional capacity, and those findings, which the ALJ referenced in the discussion of plaintiff's credibility, are sufficient to establish which evidence the ALJ accepted as true. "[A] formalistic factor-by-factor recitation of the evidence" is not required to support the necessary analysis. Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). Accordingly, the ALJ did not err in assessing plaintiff's credibility.

## CONCLUSION

For the reasons set forth above, the undersigned recommends that the Commissioner's decision in this case be AFFIRMED.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by May 24, 2012.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 10th day of May 2012.

_____
T. Lane Wilson
United States Magistrate Judge